## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| JONATHAN SLATTERY, Derivatively on Behalf of Nominal Defendant CLOUDERA, INC., <br><br> Plaintiff, <br><br> v. <br><br> THOMAS J. REILLY, JIM FRANKOLA, MARTIN COLE, KIMBERLY HAMMONDS, MICHAEL A. STANKEY, ROSEMARY SCHOOLER, PAUL CORMIER, PETER FENTON, KEVIN KLAUSMEYER, ROBERT BEARDEN, MICHAEL A. OLSON, STEVE J. SORDELLO, and PING LI, <br><br> Defendants, <br><br> and <br><br> CLOUDERA, INC., <br><br> Nominal Defendant. | C.A. No. <br><br> <u>JURY TRIAL DEMANDED</u> |

## <u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>

Plaintiff Jonathan Slattery ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant, Cloudera, Inc. ("Cloudera" or the "Company"), against certain members of its Board of Directors (the "Board") and certain of its executive officers seeking to remedy defendants' breaches of fiduciary duties, unjust enrichment, and violations of §§ 10(b), 20(a), and 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act").  Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including

1

filings by Cloudera with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## NATURE AND SUMMARY OF THE ACTION

1.      Cloudera is a software company that provides data management, machine learning, and advanced analytical tools to businesses.  Its chief product platform is a hybrid open source software model (or "HOSS") that combines Cloudera's proprietary software with open source technology, notably the Apache Software Foundation's open-source Hadoop software. The suite of applications offered through the Company's HOSS platform allow customers to collect, store, organize, and analyze large amounts of data to improve their businesses.

2.      On April 28, 2017, the Company raised approximately $235.3 million through an initial public offering (the "IPO").   The Registration Statement and Prospectus issued in connection with the IPO (collectively, the "IPO Registration Statement") touted the HOSS platform as "the most widely adopted data platform, with a growing range of applications being built on it."  The IPO Registration Statement also highlighted the Company's "land and expand" strategy, which increases sales by working with existing customers to identify new use cases, and claimed that Cloudera was "only beginning to penetrate [its] market opportunity with Global 8000 companies and public sector entities."

3.      In press releases and financial reports, the Company reported financial results that exceeded previously issued guidance and touted customer wins.  However, the truth began to emerge in a series of partial disclosures that Cloudera's software was outdated and that its "land and expand" strategy was ineffective in growing the business.

4.      On April 3, 2018, Cloudera revealed that in fiscal 2018, the Company experienced a sharp slowdown in its new expansion bookings, suggesting that its "land and

expand" model was much more limited than advertised. The Company also provided a disappointing outlook for fiscal 2019, with total revenues of only $435 million to $445 million, representing a sharp deceleration in growth.

5.      On this news, the Company's share price fell $8.95, or over 40%, to close at $13.29 per share on April 4, 2018, on unusually high trading volume.

6.      In January 2019, Cloudera acquired Hortonworks, Inc. for $5.2 billion. According to the Company, the "primary motivation for this combination [was] to accelerate innovation" and the "combined company [would] have substantial scale, resources and talent to do more faster."

7.      However, on March 13, 2019, the Company provided weak guidance for first quarter 2020, the first fiscal quarter after acquiring Hortonworks: total revenues between $187 and $190 million, and subscription revenues between $154 and $156 million.

8.      On this news, the Company's share price fell $2.90, nearly 20%, to close at $11.71 per share on March 14, 2019, on unusually high trading volume.

9.      On June 5, 2019, Cloudera revealed that despite the Hortonworks merger, Cloudera's "land and expand strategy," and a $119 million investment in sales and marketing during the quarter, the Company was losing business: its highest-spending customers were essentially flat for first quarter 2020, middle-spending customers had declined sequentially, and the Company suffered an elevated dollar churn rate of 15%.

10.      On this news, the Company's share price fell $3.59, nearly 41%, to close at $5.21 per share on June 6, 2019, on unusually high trading volume.

11.      These revelations precipitated the filing of securities class actions in the Superior Court for the County of Santa Clara in California alleging violations of Sections 11, 12, and 15

of the Securities Act of 1933, which were consolidated under the caption, *In re Cloudera, Inc., Securities Litigation*, Case No. 19CV348674 (the "Santa Clara Action"). Several securities class actions were also filed in the U.S. District Court for the Northern District of California against Cloudera and certain of defendants: *Christie v. Cloudera, Inc. et al.*, Case No. 5:19-cv-03221; *Dvornic v. Cloudera, Inc. et al.*, Case No. 3:19-cv-04310; *Zarantonello v. Cloudera, Inc. et al.*, Case No. 3:19-cv-04007 (collectively, with the Santa Clara Action, the "Securities Class Actions").

12.     At least half of the Company's current Board could not disinterestedly and independently respond to a litigation demand in connection with the misleading representations because, among other things, eight of the ten current directors are defendants in claims pursuant to Section 11 of the Securities Act of 1933, 15 U.S.C. § 77k (the "Securities Act"). Claims pursuant to Section 11 of the Securities Act do not require a showing of intent or scienter. Accordingly, the eight directors who are defendants in the Santa Clara Action face a likelihood of liability in that action, and could not disinterestedly investigate whether their violations of Section 11 constituted breaches of fiduciary duties under Delaware law.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question: violations of Section 10(b), 20(a), and 14(a) of the Securities Exchange Act of 1934. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

14.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District,

and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

**Plaintiff**

15.     Plaintiff Jonathan Slattery purchased 185 shares of Cloudera stock on July 15, 2015, and has continuously owned his Cloudera stock since that date.

**Nominal Defendant**

16.     Nominal Defendant Cloudera is a Delaware corporation with its principal executive offices located at 395 Page Mill Road, Palo Alto, CA 94306.  The Company's stock trades on the New York Stock Exchange under the symbol "CLDR."

**Defendants**

17.     Defendant Thomas J. Reilly ("Reilly") served as Chief Executive Officer ("CEO") and a director of the Company from June 2013 to July 2019.

18.     Defendant Jim Frankola ("Frankola") has served as Chief Financial Officer of the Company since October 2012.

19.     Defendant Martin Cole ("Cole") has served as a director of the Company since September 2014 and as interim CEO since July 2019.

20.     Defendant Kimberly Hammonds ("Hammonds") has served as a director of the Company since March 2017.

21.     Defendant Michael A. Stankey ("Stankey") has served as a director of the Company since February 2017.  Stankey is a member of the Company's Audit Committee.

22.     Defendant Rosemary Schooler ("Schooler") has served as a director of the Company since December 2017.  Schooler is Corporate Vice President and Manager of Data

Center Sales for Intel Corporation, which owns 9.5% of Cloudera as of February 12, 2018.  She owns 9.5% of the Company's outstanding stock.

23.    Defendant Paul Cormier ("Cormier") has served as a director of the Company since January 2019.  Cormier served as a director of Hortonworks from October 2011 until January 2019 when it merged with Cloudera.

24.    Defendant Peter Fenton ("Fenton") has served as a director of the Company since January 2019.  Fenton is a member of the Company's Audit Committee.  Fenton served as a director of Hortonworks from July 2011 until January 2019 when it merged with Cloudera.

25.    Defendant Kevin Klausmeyer ("Klausmeyer") has served as a director of the Company since January 2019.  Klausmeyer is a member of the Company's Audit Committee. Klausmeyer served as a director of Hortonworks from August 2014 until January 2019 when it merged with Cloudera.

26.    Defendant Robert Bearden ("Bearden") has served as a director of the Company since January 2019.   Bearden co-founded Hortonworks and held several positions at Hortonworks: he served as its Chief Executive Officer from February 2012 to January 2019, as President from June 2018 to January 2019, and as a director from April 2011 to January 2019.

27.    Defendant Michael A. Olson ("Olson") co-founded Cloudera and served as Chairman of the Board of Directors and Chief Strategy Officer of the Company until January 3, 2019.

28.    Defendant Steve J. Sordello ("Sordello") served as a director of the Company from September 2014 until January 3, 2019.

29.    Defendant Ping Li ("Li") served as a director of the Company from October 2008 to July 2018.

30.     The defendants named in ¶¶17-29 are sometimes referred to hereinafter as the "Individual Defendants."

## **DUTIES OF THE INDIVIDUAL DEFENDANTS**

31.     By reason of their positions as officers, directors, and/or fiduciaries of Cloudera and because of their ability to control the business and corporate affairs of Cloudera, at all relevant times, the Individual Defendants owed Cloudera and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were required to use their utmost ability to control and manage Cloudera in a fair, just, honest, and equitable manner.   The Individual Defendants were required to act in furtherance of the best interests of Cloudera and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.   Each director and officer of the Company owes to Cloudera and its shareholders a fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

32.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Cloudera, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.   Because of their advisory, executive, managerial, and directorial positions with Cloudera, each of the Individual Defendants had knowledge of material non-public information regarding the Company.

33.     To discharge their duties, the officers and directors of Cloudera were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.   By virtue of such duties, the officers and directors of Cloudera were required to, among other things:

(a) Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

(b) Exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

(c) Exercise good faith to ensure that the Company's communications with the public and with shareholders are made with due candor in a timely and complete fashion; and

(d) When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

## SUBSTANTIVE ALLEGATIONS

**Background**

34.     Cloudera derives its revenue from two sources: (i) one- to three-year subscriptions, for which revenue is recognized ratably over the subscription period; and (ii) professional services that Cloudera provides to help companies implement and use their subscriptions.

35.     Defendants have great visibility into current and expected revenue trends because subscription revenue recurs over an extended time period and most of the Company's revenue is derived from subscriptions.  For example, in fiscal 2017, approximately three-fourths of the Company's revenue was from subscriptions.  Moreover, a substantial portion of the Company's bookings sold in a given quarter are billed in a subsequent quarter, providing greater insight into existing revenue trends.

36.     Since its founding, Cloudera quickly grew to become one of the largest data analytics firms, boasting that 500 members of the "Global 8000," a list of the largest corporate enterprises globally, were among the Company's customers as of 2017.  Additionally, the

Company's total annual revenues increased approximately 140% within two years, from $109 million in fiscal 2015 to $261 million in fiscal 2017.

**Defendants Complete the IPO Pursuant to the Misleading Registration Statement**

37. On March 31, 2017, Defendants caused Cloudera to file the IPO Registration Statement with the SEC.  Defendants Reilly, Frankola, Olson, Cole, Hammonds, Li, Sordello, and Stankey each signed the IPO Registration Statement.

38. On April 28, 2017, Cloudera filed its final Prospectus with the SEC, and the Company went public through the IPO.  In the IPO, the Company sold 15,000,000 shares to the public at $15 per share and granted its underwriters the option to purchase up to 2,250,000 additional shares.  The Company raised approximately $235.3 million proceeds, net of underwriter discounts and commissions.

39. The IPO Registration Statement claimed that the Company's rapid historical growth would continue following the IPO.  For example, the IPO Registration Statement stated that Cloudera's revenues increased from $166 million in fiscal 2016 to $261 million by fiscal 2017, "representing year-over-year growth in revenue of 57% for [the] most recent fiscal year."  Moreover, the IPO Registration Statement stated that the Company had "experienced rapid growth in recent periods and expect[s its] growth to continue" and that the HOSS platform was "the most widely adopted data platform, with a growing range of applications being built on it."

40. The IPO Registration Statement claimed that Cloudera "will further expand [its] customer opportunity through the continued growth in use cases and packaged solutions, the expansion of [its] partner ecosystem and the proliferation of skills, driven by ease of use and accelerating adoption of the cloud."  According to the IPO Registration Statement, Cloudera was "only beginning to penetrate [its] market opportunity with Global 8000 companies and public

sector entities," and the Company would use the IPO proceeds to fund the "expected growth" after transitioning to a public company.

41.     The IPO Registration Statement also claimed that Cloudera's focus on the world's largest businesses provided a competitive advantage for the Company to continue its growth, stating:

> We market and sell our platform to a broad range of organizations, although we focus our selling efforts on large enterprises, primarily the Global 8000, as well as large public sector organizations. ***We target these organizations because they capture and manage the vast majority of the world's data and operate highly complex IT environments, and our enterprise-grade platform has the greatest opportunity to benefit these organizations. Our total number of Global 8000 customers grew from 255 as of January 31, 2015 to 381 as of January 31, 2016 and grew to 495 as of January 31, 2017. For the fiscal years ended January 31, 2015, 2016 and 2017, revenue from our Global 8000 customers represented 61%, 71% and 73% of total revenue, respectively, based on the Global 8000 constituents as of November 1, 2016.*** For fiscal 2015, 2016 and 2017, revenue from our public sector, including large public sector, customers represented 11%, 9% and 10% of total revenue, respectively.

(Emphasis added.)

42.     Furthermore, the IPO Registration Statement highlighted the Company's "land and expand" strategy, which "use[s] the initial sale as a foothold to increase revenue per customer by increasing the amount of data and number of use cases each customer runs through [Cloudera's] platform."  After the initial sale, the Company purportedly continues to "work with [its] customers to identify new use cases that can be developed on or moved to [its] platform, ultimately increasing the amount of data managed on [its] platform as well as the number and size of [its] platform deployments."  Cloudera was committed to "expand[ing its] category leadership in open source data management" and "expanding [its] strategic partnerships and alliances, to acquire new customers and increase penetration among existing customers," with a "business model focuse[d] on maximizing the lifetime value of a customer relationship."

43.     The IPO Registration Statement claimed that, as customers continued to adopt Cloudera products, the Company's upfront investments and associated costs would decrease.  It stated that "over time, as [Cloudera's] customer base grows and a relatively higher percentage of [its] subscription revenue is attributable to renewals or greater usage among existing customers relative to new customers, associated sales and marketing expenses and other allocated upfront costs as a percentage of revenue will decrease."  As a result, the Company would generate positive cash flows and profits.

44.     These statements in the IPO Registration Statement were materially misleading because they failed to disclose: (i) that Cloudera's Hadoop-based technology was becoming dated; (ii) that Cloudera suffered from pricing and servicing disadvantages because competitors' products are more fully integrated with their other product offerings that had already been adopted by businesses; (iii) that, as a result, Cloudera could not overcome competition from new cloud-based offerings such as Amazon Web Services, Microsoft Azure, and Google Compute Cloud; (iv) that Cloudera experienced difficulty identifying large enterprises to adopt its Hadoop-based platform; (v) that Cloudera experienced decreasing opportunities to sign up new customers; (vi) that Cloudera's "land and expand" strategy was unsuccessful because relatively few customers were willing to expand their use of the Company's products; (vii) that, as a result of the foregoing, Cloudera would invest substantial capital in sales and marketing activities to generate new revenues; and (viii) that, as a result of the foregoing, Cloudera could not generate annual positive cash flows for the foreseeable future.

**Defendants Knowingly Permitted the Company to Issue Misleading Statements**

45.     On June 8, 2017, Defendants caused the Company to issue a press release announcing its first quarter 2018 financial results, reporting total revenues of $79.6 million (a

41% increase), subscription revenue of $64.7 million (a 59% increase), and positive $5 million in cash flow.

47.     On the earnings call to discuss these results, defendant Reilly stated: "This quarter we had some great new customer wins while some key existing customers expanded their utilization of our platform through additional use cases."

47.     On the same call, defendant Frankola represented that Cloudera was successfully expanding revenues derived from existing customers, stating in relevant part:

> [W]e benefit from multiple growth vectors. As customer data grows revenue grows. As new use cases are deployed revenue grows. And as partners build applications on our platform revenue grows. Note that a relatively small portion of revenue relates to professional services and training which are focused on ensuring customer success and driving expanded use of our platform.

48.     After highlighting the Company's 142% net expansion rate in the quarter, defendant Frankola stated that Cloudera still had "plenty of room for growth within the segment" as it had only "penetrated only about 6% of the Global 8,000 and have thus far captured just a small portion of our customers' data-related spending."

49.     On June 9, 2017, Cloudera filed its quarterly report on Form 10-Q with the SEC for the period ended April 30, 2017, which was signed by defendants Reilly and Frankola.

50.     On September 7, 2017, defendants caused the Company to issue a press release announcing its second quarter 2018 financial results, reporting total revenues of $89.8 million (a 39% increase) and subscription revenue of $74 million (a 46% increase).  In the press release, defendant Reilly was quoted as stating: "In our fiscal second quarter, we outperformed on sales, customer acquisition, customer expansion and cash flow objectives."

51.     On the earnings call to discuss these results, defendant Reilly stated: "We are reporting a strong second quarter, driven by much of the new product innovation we've recently

announced."  He further stated: "In Q2, we executed well as a company, and we continued to benefit from major secular trends in machine learning, cloud and the Internet of Things."

52.     Similarly, defendant Frankola highlighted that the Company had added "45 net new Global 8000 customers in the quarter" and represented that, "[i]n Q2, many of these customers increased their utilization of the Cloudera platform, fueling growth and driving [Cloudera's] net expansion rate to 140% for the quarter."  He also stated: "We continue to be successful in acquiring and growing large customers, and the benefits of our land-and-expand model are evident in our improving margins and cash flow."

53.     Defendant Frankola also claimed that the Company's plan to decrease spending on new revenues, and ultimately move toward profitability, was working.  He stated in relevant part:

> Sales and marketing expense was $49.6 million for the second quarter or 55% of total revenue. This compares to 70% of revenue in the year-ago period. This progress is consistent with our expectations. The unique dynamics of the Cloudera model, with higher customer acquisition costs offset by much higher customer lifetime value, produces improving sales efficiencies as our customers grow.

54.     In response to an analyst question, defendant Reilly stated that the Company's salesforce was executing exceptionally well and that its focus on large customers was working. Defendant Reilly stated in pertinent part:

> We continually increase our focus on going after the Global 8000.  It's how we have aligned our sales force.  It's how we drive our marketing.  It's how we work with our partners in identifying industry-specific solutions, and I think that focus has really benefited us in capturing and is – we've executed very well.  I think our competitors have made some missteps and that created some opportunities where we gained some more wins. But I would take greater pride in just our focus. All of R&D is going after the needs of large enterprises in these hybrid and multi-cloud environments, and that is differentiating us.

55.     On September 12, 2017, Defendants caused the Company to file its quarterly report on Form 10-Q with the SEC for the period ended July 31, 2017, which was signed by defendants Reilly and Frankola.

56.     On September 15, 2017, Defendants caused the Company to announce a follow-on stock offering, in which it ultimately sold over 15.4 million shares at $16.45 per share, raising gross proceeds of $253 million.  Company insiders sold the vast majority of these shares, and defendant Olson sold more than $9 million worth of shares.

57.     On December 7, 2017, Defendants caused the Company to issue a press release announcing its third quarter 2018 financial results, reporting total revenues of $94.6 million (a 41% increase) and subscription revenue of $78.1 million (a 48% increase).  In the press release, defendant Reilly stated:  "We had another strong quarter in Q3, exceeding expectations on financial measures while increasing our competitive advantage in cloud analytics through significant new product innovation."  He further claimed that Cloudera was "now at the scale where [it] can execute on multiple fronts concurrently" and that its "financial model is exhibiting consistent operating leverage as [Cloudera] march[es] toward operating cash flow break-even."

58.     On the earnings call to discuss these results, defendant Olson stated that Cloudera was "pleased with [its] growing partnerships with Amazon and Microsoft as they realize the Company's platform built on SDX [i.e., Shared Data Experience] can bring large enterprises with mission critical applications to their cloud infrastructure."

59.     Defendant Reilly highlighted the Company's purported growth and increasing capture of a dynamic market, stating in relevant part:

> The market opportunity is large, and the innovation we are delivering is essential to capturing more of it.  We're in the early stages of a high-growth market with a rate and pace of change that is staggering.  Our team is navigating it well with consistent execution, and we're confident in our strategy.   We continue to gain

share with the most valuable customers, large enterprises and public sector entities globally. And we're pleased with the operating leverage demonstrated in our business model.  We remain focused on the long term, and will continue to invest in our partners, the community and in developing differentiated technology.

60.     Defendant Frankola, meanwhile, stated that the Company was only "4 to 6 quarters away from estimated cash flow positive."

61.     On December 8, 2017, Defendants caused the Company to file its quarterly results on Form 10-Q with the SEC for the period ended October 31, 2017, which was signed by defendants Reilly and Frankola.

62.     The statements referenced above were materially misleading because they failed to disclose: (i) that Cloudera's Hadoop-based technology was becoming dated; (ii) that Cloudera suffered from pricing and servicing disadvantages because competitors' products are more fully integrated with their other product offerings that had already been adopted by businesses; (iii) that, as a result, Cloudera could not overcome competition from new cloud-based offerings such as Amazon Web Services, Microsoft Azure, and Google Compute Cloud; (iv) that Cloudera experienced difficulty identifying large enterprises to adopt its Hadoop-based platform; (v) that Cloudera experienced decreasing opportunities to sign up new customers; (vi) that Cloudera's "land and expand" strategy was unsuccessful because relatively few customers were willing to expand their use of the Company's products; (vii) that, as a result of the foregoing, Cloudera would invest substantial capital in sales and marketing activities to generate new revenues; and (viii) that, as a result of the foregoing, Cloudera could not generate annual positive cash flows for the foreseeable future.

**The Truth Begins to Emerge**

63.     On April 3, 2018, Cloudera issued a press release announcing its fourth quarter and full year 2018 financial results, reporting total revenues of $103.5 million and subscription

revenues of $84.3 million, and a negative operating cash flow of $22 million.  The Company also provided a disappointing outlook for fiscal 2019, with total revenues of only $435 million to $445 million, representing a sharp deceleration in growth.  In addition, the Company stated that it expected negative operating cash flows for the year between $370 million and $375 million and non-GAAP losses between $0.62 to $0.59 per share.

64.     On the earnings call to discuss these results, defendants Reilly and Frankola revealed that in fiscal 2018, the Company experienced a sharp slowdown in its new expansion bookings, suggesting that its "land and expand" model was much more limited than advertised.  Defendant Reilly announced a plan to target "a subset of the Global 8000" to "optimize [its] go-to-market efforts for the greatest return," which would "enable [Cloudera] to grow faster and generate cash sooner."  This further confirmed that customers were not growing their use of the Company's products at a sufficient rate.  In addition, defendant Reilly announced a substantial reorganization of the Company's salesforce and the appointment of a new head of Global Field Operations.

65.     On this news, the Company's share price fell $8.95, or over 40%, to close at $13.29 per share on April 4, 2018, on unusually high trading volume.

66.     However, this was only partially revealing because defendant Reilly flatly rejected any long-term demand problems, stating "I see nothing that gives me concern about the market" and there are "no changes in the competitive landscape nor end market demand."  He assured that "Cloudera is well positioned to continue to grow" and that "the changes [the Company has] undertaken have strengthened [its] prospects."  Moreover, defendant Reilly claimed that new product offerings like cloud-based data management were a "tremendous tailwind" because Cloudera had "figured out how to win in that market and then stay focused on

large enterprises who value [the Company's] enterprise features." He even claimed that Cloudera was "better than Amazon on Amazon" because its "products on Amazon are integrated better and operate better than Amazon's own offerings." On the same call, defendant Frankola stated that Cloudera was "still confident [it would] get to that cash flow-positive in 2020," indicating a substantial growth in billings with proportionately lower spend in coming quarters.

67. On April 4, 2018, Defendants caused the Company to file its annual report on Form 10-K with the SEC for the period ended January 31, 2018, which was signed by Reilly, Frankola, Olson, Cole, Hammonds, Li, Schooler, Sordello, and Stankey.

**Defendants Continue to Issue Materially Misleading Statements**

68. On May 16, 2018, defendants Reilly, Olson, Cole, Hammonds, Li, Schooler, Sordello, and Stankey issued a definitive proxy statement soliciting stockholder votes in advance of the Company's annual meeting to be held June 27, 2018. In the proxy statement, these eight defendants solicited stockholder votes in favor of two management proposals including a proposal to elect Reilly, Cole, and Stankey to new terms as directors.

69. The proxy statement disclosed that the Board had determined that defendants Reilly and Olson were not independent directors. Regarding corporate governance, the proxy statement stated:

> Our board does not have a standing risk management committee, but administers this oversight function directly through the board as a whole, as well as through its standing committees that address risks inherent in their respective areas of oversight. In particular, our audit committee has the responsibility to consider and discuss our major financial risk exposures and the steps our management has taken to monitor these exposures, our compensation committee monitors and reviews with management our major compensation-related risk exposures, including whether any of our compensation policies and programs has the potential to encourage excessive risk-taking, our nominating and governance committee monitors and reviews with management our major legal compliance risk exposures and the steps management has taken to monitor or mitigate these exposures, including our procedures and related policies for with respect to risk

assessment and risk management, and our board is responsible for monitoring and assessing strategic risk exposure and other risks not covered by our committees.

70.     The proxy statement was materially misleading because it misrepresented the Board's actual activities with respect to risk management while soliciting votes to reelect and compensate directors who were breaching their fiduciary duties.    A reasonable shareholder would have found the truth to be material when deciding whether to vote for or against these proposals.

71.     On June 6, 2018, Defendants caused the Company to issue a press release announcing its first quarter 2019 financial results, reporting total revenues of $102.7 million (a 29% increase) and subscription revenue of $85.9 million (a 33% increase) for the quarter.  These figures were in-line with or slightly above the Company's prior guidance.

72.     On the earnings call to discuss these results, defendant Reilly stated that the previously announced strategic moves had "gone as anticipated" and that the changes would "enhance the Company's posture for sustained long-term growth."   He also claimed that Cloudera would "compete very effectively" against competition such as Microsoft, Google and Amazon because "[w]hen we are competing in the cloud, we have so many advantages."

73.     The same day, Defendants caused the Company to file its quarterly report on Form 10-Q with the SEC for the period ended April 30, 2018, which was signed by defendants Reilly and Frankola.

74.     On June 29, 2018, the Company filed with the SEC a Form 8-K disclosing the results from the votes on the proposals contained in the 2018 proxy statement.  In particular, Reilly, Cole, and Stankey were reelected to terms as directors.  The reelection of Reilly, Cole, and Stankey based on the misleading statements in the 2018 proxy statement and other public

filings was a fundamental link in these directors' continued breaches of fiduciary duties and the continued enrichment of defendants at the expense of the Company's unaffiliated stockholders.

75.    On September 5, 2018, Cloudera issued a press release announcing its second quarter 2019 financial results, reporting total revenues of $110.3 million (a 23% increase) and subscription revenue of $93.1 million (a 26% increase) for the quarter.  These figures exceeded the Company's prior guidance.  In the press release, defendant Reilly stated: "[i]n Q2 we made substantial progress in our product and go-to-market transitions, delivering strong financial results in the quarter and accomplishing many of our goals for sustained success in our market."

76.    On the earnings call to discuss these results, defendant Reilly reiterated that the Company's new sales strategies and initiatives were working, stating in relevant part:

> [I]n Q2, we made substantial progress in our product and our go-to-market initiatives, delivering strong financial results in the quarter and accomplishing many of our goals for sustained success in our markets. I am pleased with our execution in the quarter and look forward to continued improvement in performance as all of our initiatives are fully implemented.

> It is encouraging to see the changes we are making being validated by customers and partners. In addition, the secular tailwinds in our market remain intact and demand is strong across our solution set.

77.    Defendant Frankola likewise stated: "[w]e had a strong quarter across the board, especially concerning the key initiatives of our transition plan."  He continued: "[T]he 128% net expansion rate in Q2 was better than expected due to improved renewal rates and increased focus on customer success.  Collectively, these measures best reflect our ability to both acquire target customers and advance customers along the journey towards increasingly attractive unit economics."

78.    Defendant Reilly later echoed these sentiments, stating that in all three major areas of focus for the Company it was "doing extremely, extremely well."  He also claimed that

Cloudera was "putting in place [a] channel to allow [it] to address a broader market at a lower acquisition cost and support cost."

79.     On September 6, 2018, Defendants caused the Company to file its quarterly report on Form 10-Q with the SEC for the period ended July 31, 2018, which was signed by defendants Reilly and Frankola.

80.     The statements referenced above were materially misleading because they failed to disclose: (i) that Cloudera's Hadoop-based technology was becoming dated; (ii) that Cloudera suffered from pricing and servicing disadvantages because competitors' products are more fully integrated with their other product offerings that had already been adopted by businesses; (iii) that, as a result, Cloudera could not overcome competition from new cloud-based offerings such as Amazon Web Services, Microsoft Azure, and Google Compute Cloud; (iv) that Cloudera experienced difficulty identifying large enterprises to adopt its Hadoop-based platform; (v) that Cloudera experienced decreasing opportunities to sign up new customers; (vi) that Cloudera's "land and expand" strategy was unsuccessful because relatively few customers were willing to expand their use of the Company's products; (vii) that, as a result of the foregoing, Cloudera would invest substantial capital in sales and marketing activities to generate new revenues; and (viii) that, as a result of the foregoing, Cloudera could not generate annual positive cash flows for the foreseeable future.

**Defendants Cause the Company to Acquire Hortonworks, Inc. Pursuant to a Misleading Registration Statement**

81.     On October 3, 2018, Cloudera announced that it had entered into a definitive merger agreement with its primary competitor in the Hadoop data analytics space, Hortonworks, Inc. (the "Hortonworks Merger").   In the stock-for-stock deal valued at $5.2 billion, Hortonworks shareholders would own 40% of the combined Company and receive 1.305

common shares of Cloudera for each share of Hortonworks stock they owned.  In the press release, defendant Reilly stated that the "businesses are highly complementary and strategic," that they would "deliver the industry's first enterprise data cloud from the Edge to AI," and that they would "advance [Cloudera's] shared commitment to customer success in [its] pursuit of digital transformation."

82.     On a conference call held to discuss the merger with analysts and investors, defendant Reilly stated that the "primary motivation for this combination is to accelerate innovation" and the "combined company will have substantial scale, resources and talent to do more faster."  He continued: "[b]eyond accelerating innovation in cloud technology, the transaction also produces significant financial benefits, including large cost synergies."

83.     In the same call, defendant Frankola claimed that the merger would lead to significant synergies and lower costs, stating in pertinent part:

> The 2 companies together combine for almost [$0.75 billion] of revenue, growing in excess of 30% a year.  These are all previously reported numbers presented as of our respective Q2s. We expect to close the merger in calendar Q1 of next year so the pro forma combined will be meaningfully larger.  The important point is that the day the merger closes, we will have significant scale and growth.
>
> This combination will unlock powerful synergies. The deal was driven primarily by the strategic merit that Tom and Rob discussed. These benefits will likely generate additional revenue opportunity. However, we have not built any potential revenue upside into our financial model.  Given the strategic fit between the companies, we are confident that there will be significant opportunities to improve both the efficiency and the effectiveness of our internal operations.  We expect these improvements to drive more than $125 million of cost synergies per year while allowing additional investment in growth areas including IoT, hybrid cloud, data warehousing, machine learning and AI.
>
> * * *
>
> As a finance person, this is where I get most excited. This transition significantly accelerates the path to our long-term model. We expect to continue to grow quickly while generating significant cash flow. Calendar year '19, or fiscal year '20 for Cloudera, will be the year where we integrate the companies and take steps to generate more than $125 million in annual cost synergies.  Calendar year

'20 or fiscal year '21 shows what the new company is expected to look like once we have achieved most of the savings. At that time, we expect to be more than $1 billion in revenue, growing at more than 20% per year and generating more than 15% operating cash flow margin.

84.     On November 5, 2018, Defendants caused Cloudera to file the registration statement for the Hortonworks Merger with the SEC (the "Merger Registration Statement"). Defendants Reilly, Frankola, Olson, Cole, Hammonds, Schooler, Sordello, and Stankey each signed the Merger Registration Statement. Moreover, Defendants Bearden, Cormier, Fenton, and Klausmeyer participated in the preparation of the Merger Registration Statement as incoming members of Cloudera's Board upon the close of the Hortonworks Merger.

85.     The Merger Registration Statement repeatedly touted the Company's expertise in cloud infrastructure, stating that its offerings were "optimized for the cloud," that its "original architecture was designed for the cloud," and that Cloudera is "[l]eading cloud innovation for big data" and could "leverage the latest advances in infrastructure including the public cloud for 'big data' applications." The Merger Registration Statement also stated that Cloudera's platform provided "[c]loud and on-premises deployment at scale and across hybrid cloud environments," and "allows enterprises to manage both long-lived and transient workloads across environments, mixing on-premises and public cloud infrastructure, including all major public cloud vendors – Amazon Web Services, Microsoft Azure and Google Cloud Platform" and "across any mix of public cloud or on-premises." It further touted that Cloudera's "Altus is a cloud service that . . . enable[s] customers to address a new set of elastic and transient workloads that would otherwise be impractical to run in the datacenter" and highlighted its purportedly "ongoing performance in the areas of cloud" and commitment to "deliver the industry's first enterprise data cloud" and "[c]loud . . . deployment at scale."

86. The Merger Registration Statement also claimed that the Hortonworks Merger would further Cloudera's "land and expand" strategy, "increase cross-sell opportunities," "enlarge addressable market," "[e]xpand[] buyer universe," and "improve Cloudera's . . . existing ability to expand customer relationships and increase the penetration of new customer accounts."

87. Regarding employee recruitment and retention, the Registration Statement stated that Cloudera employees "may experience uncertainty about their future roles with the combined company until, or even after, strategies with regard to the combined company are announced and executed," and a "failure . . . to . . . retain and motivate executives and other key employees . . . could have a negative impact on their respective businesses."

88. On December 5, 2018, Defendants caused the Company to issue a press release announcing its third quarter 2019 financial results, reporting total revenues of $118.2 million (a 25% increase) and subscription revenue of $99.7 million (a 28% increase) for the quarter. These figures again exceeded the Company's prior guidance. Defendant Reilly stated in the press release:

> We are pleased with our execution in Q3 and our progress on the strategic combination we have announced with Hortonworks. Pre-closing merger integration planning is going well. And more importantly, we are very encouraged by the reception that our plans are receiving from customers, partners and the developer community. Together, we will enhance our competitiveness, accelerate our momentum in cloud innovation, and provide a comprehensive solution-set for customers, from the Edge to AI.

89. On the earnings call to discuss these results, defendant Reilly stated: "[w]hile much of our focus is on long-term strategy and merger planning, it is reassuring to see continued favorable results from the go-to-market changes we initiated a few quarters ago." He also touted the purported benefits of the Hortonworks Merger, claiming that Cloudera had "identified the potential for even greater synergies than assumed" and stating in relevant part:

The combination of Cloudera and Hortonworks will fuel innovation at a greater rate and pace than we could have achieved as stand-alone companies.  The new Cloudera will have the scale, resources and talent to do more and do it faster.  Our significant investments in engineers and committers working with the open-source community will enable us to innovate on key technologies ranging from real-time streaming at the Edge to an enterprise-grade cloud-native data warehouse and a new platform to industrialize AI, all delivering the industry's first enterprise data cloud.

* * *

The combination of Cloudera and Hortonworks creates a clear market leader in industry standard for a modern data platform, producing significant advantages for customers and partners. Establishing the industry standard minimizes risk and improves clarity for customers. It simplifies customers' evaluation processes and speeds decision-making. The standard also focuses the open-source communities' innovative efforts.

* * *

Last but certainly not least are the significant financial synergies produced by merging the 2 companies. We expect to generate substantially more cash in a shorter time frame than if we had remained independent companies. We will also accelerate the achievement of our long-term target model. Although the merger will generate large cost savings, it is important to note that we intend to invest some of those savings into enhanced go-to-market capabilities and the technological innovations mentioned previously.

90.     In the same call, defendant Reilly denied that Cloudera's platform was becoming outdated, stating "Cloudera is in a very unique competitive position to capture the market growth where the market is headed."

91.     Defendant Frankola stated that Cloudera had another good quarter "across the board" and its solid customer metrics "reflect [the Company's] ability to both acquire target customers and advance customers along a journey towards increasingly attractive unit economics."  He also claimed that Cloudera had already achieved "20% of merger synergies before the deal has closed."  Later, defendant Frankola stated:

I mean, from my standpoint, everything that I see gives us confidence . . . everything that we see happening with the merger with Hortonworks, the ability to cross-sell product – I don't need to go through the whole pitch of innovation

and cloud and so forth, all of that will be a tailwind for positive growth in net expansion rates.

92.     On December 6, 2018, Cloudera filed its quarterly report on Form 10-Q for the period ended October 31, 2018, which was signed by defendants Reilly and Frankola.

93.     The statements in the Merger Registration Statement and the statements made in connection with the third quarter 2019 financial results referenced above were materially misleading because they failed to disclose: (i) that Cloudera's Hadoop-based technology was becoming dated; (ii) that Cloudera suffered from pricing and servicing disadvantages because competitors' products are more fully integrated with their other product offerings that had already been adopted by businesses; (iii) that, as a result, Cloudera could not overcome competition from new cloud-based offerings such as Amazon Web Services, Microsoft Azure, and Google Compute Cloud; (iv) that Cloudera experienced difficulty identifying large enterprises to adopt its Hadoop-based platform; (v) that Cloudera experienced decreasing opportunities to sign up new customers; (vi) that Cloudera's "land and expand" strategy was unsuccessful because relatively few customers were willing to expand their use of the Company's products; (vii) that, due to the lack of management response to these issues, Cloudera's sales force left the company such that approximately 50% of the salesforce as of the Hortonworks Merger were new employees who were unfamiliar with existing, new, and expansion sales cycles; (viii) that, as a result of the foregoing, Cloudera would invest substantial capital in sales and marketing activities to generate new revenues; and (ix) that, as a result of the foregoing, Cloudera could not generate annual positive cash flows for the foreseeable future.

**The Truth Continues to Emerge**

94.     On January 3, 2019, the Hortonworks Merger closed.

95.     On March 13, 2019, Defendants caused the Company to issue a press release announcing its fourth quarter and full year 2019 financial results, reporting total revenues of $144.5 million and subscription revenue of $123 million for the quarter.  However, the Company provided weak guidance for first quarter 2020, the first fiscal quarter after the completion of the Hortonworks Merger: total revenues between $187 and $190 million, and subscription revenues between $154 and $156 million.  For fiscal 2020, the Company expected total revenues between $835 million and $855 million, subscription revenues between $695 million and $705 million, and negative operation cash flow of $30 million to $40 million.

96.     On the earnings call to discuss these results, defendant Frankola revealed that the merged entity would need to take a $62 million "haircut" due to purchase price accounting adjustments and also a $28 million write-down of deferred commission expenses.  In addition, he stated that differences in billing periods between the companies would reduce 2020 cash flows by $125 million as the legacy companies reconciled their billing cycles.

97.     On this news, the Company's share price fell $2.90, nearly 20%, to close at $11.71 per share on March 14, 2019, on unusually high trading volume.

98.     However, this was only partially revealing because defendants Reilly and Frankola assured that the disappointing guidance was not related to the fundamentals of the Company and that Cloudera was successfully outcompeting its rivals.  On the earnings call to discuss full year 2019 financial results, defendant Frankola stated that Cloudera still "anticipate[d] significant improvements in R&D, sales and marketing and G&A expense ratios as [the Company] complete[d] [its] merger synergy actions."  Similarly, defendant Reilly stated: "Merger integration is going well and ahead of schedule."  Defendant Reilly also dismissed concerns about competition from other providers such as Amazon, stating: "we feel very strong

that market is moving in our direction around the hybrid multi-cloud, and then our functionality is best-in-class."

**The Truth Fully Emerges**

99.     On June 5, 2019, Cloudera issued a press release announcing disappointing first quarter 2020 financial results, reporting revenue of $187.5 million and losses from operations of $103.8 million.  The Company also disclosed that several customers had elected to "postpone renewal and expansion" of their subscription agreements.  Despite the Hortonworks Merger, Cloudera's "land and expand strategy," and the $119 million investment in sales and marketing during the quarter, Cloudera was losing business: its highest-spending customers were essentially flat for the quarter, middle-spend customers had declined sequentially, and the Company suffered an elevated dollar churn rate of 15%.

100.    The Company also slashed its full-year outlook, reducing total revenue guidance by $90 million and stating it expected recurring revenue growth of only 0% to 10% for the year (compared to 18% to 21% in the prior issued guidance) and that it now expected to suffer a negative cash flow from operations of between $75 million and $95 million for the year, more than double the amount stated in the previously issued guidance.  The same day, Cloudera announced that Reilly would retire from the Company.

101.    Analysts questioned the reason for the abrupt slowdown, pointing to increased competition, especially by large cloud providers such as Google, Microsoft, and Amazon.  On the earnings call to discuss the results, one analyst wondered whether customers were "simply migrating to a different form of data architecture" and abandoning the Company's Hadoop-based platform as obsolete.

102.    One analyst suggested that Cloudera customers were not buying the cloud product and existing customers were not renewing because they could perform their own data

management services, asserting: "you're basically saying it's moving to the cloud or just most are non-renewals . . . going to self-support or just delays, which is essentially self-support."

103.    Similarly, an analyst at Needham & Company called the results a "thesis changer."   An analyst at Stifel described Cloudera's shocking cut to guidance as "one of the deepest cuts we can remember in the software space since the dot.com meltdown." An analyst at D.A. Davidson described the results as "disastrous" and acknowledged: "We have stubbornly stuck with Cloudera . . . . In retrospect, we were very wrong, and perhaps relied too heavily on taking management at its word."

104.    On this news, the Company's share price fell $3.59, nearly 41%, to close at $5.21 per share on June 6, 2019, on unusually high trading volume.

## DAMAGES TO THE COMPANY

105.    As a direct and proximate result of the Individual Defendants' conduct, Cloudera has been seriously harmed and will continue to be.  Such harm includes, but is not limited to:

   a.   Legal fees incurred in connection with the Securities Class Actions;

   b.   Any funds paid to settle the Securities Class Actions;  and

   c.   Costs incurred from compensation and benefits paid to the defendants who have breached their duties to Cloudera.

106.    In addition, Cloudera's business, goodwill, and reputation with its business partners, regulators, and shareholders have been gravely impaired.  The Company still has not fully admitted the nature of its false statements and the true condition of its business.  The credibility and motives of management are now in serious doubt.

107.    The actions complained of herein have irreparably damaged Cloudera's corporate image and goodwill.  For at least the foreseeable future, Cloudera will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in

illegal behavior and have misled the investing public, such that Cloudera's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

108.    Plaintiff brings this action derivatively in the right and for the benefit of Cloudera to redress injuries suffered, and to be suffered, by Cloudera as a direct result of breaches of fiduciary duty by the Individual Defendants, unjust enrichment, and violations of Sections 10(b), 20(a), and 14(a) of the Exchange Act.  Cloudera is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

109.    Plaintiff will adequately and fairly represent the interests of Cloudera in enforcing and prosecuting its rights.

110.    Plaintiff has continuously been a shareholder of Cloudera at times relevant to the wrongdoing complained of and is a current Cloudera shareholder.

111.    When this action was filed, Cloudera's Board of Directors consisted of director defendants Bearden, Cole, Cormier, Fenton, Hammonds, Klausmeyer, Schooler, Stankey and non-party directors Nicholas Graziano and Jesse A. Lynn.  Plaintiff did not make any demand on the Board to institute this action because such a demand would be a futile, wasteful, and useless act, for the reasons set forth below.

**Bearden, Cole, Cormier, Fenton, Hammonds, Klausmeyer, Schooler, and Stankey**

112.    Due to their wrongdoing alleged herein in connection with the Merger Registration Statement, Bearden, Cole, Cormier, Fenton, Hammonds, Klausmeyer, Schooler, and Stankey are defendants in *In re Cloudera, Inc., Securities Litigation*, Case No. 19CV348674. Claims pursuant to Section 11 of the Securities Act do not require a showing of intent or scienter. Accordingly, Bearden, Cole, Cormier, Fenton, Hammonds, Klausmeyer, Schooler, and Stankey

face a likelihood of liability in that action, and thus would be interested in a demand regarding their own wrongdoing, and demand is futile as to them.

**Cole, Hammonds, Schooler, and Stankey**

113.    Cole, Hammonds, Schooler, and Stankey signed, and thus personally made, the misleading statements in the Form 10-K filed on April 4, 2018 for the period ended January 31, 2018.  As a result, Cole, Hammonds, Schooler, and Stankey would be interested in a demand regarding their own wrongdoing, and demand is futile as to them.

**Cole, Hammonds, and Stankey**

114.    Cole, Hammonds, and Stankey signed, and thus personally made, the misleading statements in the IPO Registration Statement.  As a result, Cole, Hammonds, and Stankey would be interested in a demand regarding their own wrongdoing, and demand is futile as to them.

115.    Cole, Hammonds, and Stankey could not disinterestedly consider a demand to action in connection with the misleading proxy statement issued in May 2018.  These three directors issued the proxy statement knowing that representations made in the IPO Registration Statement, which they had signed, were misleading and did not completely disclose same prior to issuance of the proxy statement or the shareholder vote in June 2018.  Had these three directors truthfully and completely revealed the misleading nature of the IPO Registration Statement and of subsequent disclosures, Reilly, Cole, and Olson would not have been reelected as directors. As a result, Cole, Hammonds, and Stankey would be interested in a demand regarding the misleading proxy statement, and demand is excused as to them on that basis as well.

**Defendants Klausmeyer, Fenton, and Stankey**

116.    Klausmeyer, Fenton, and Stankey served as members of the Company's Audit Committee since January 2019.  As such, they are responsible for the effectiveness of the Company's internal controls, the integrity of its financial statements, and its compliance with

laws and regulations.  Klausmeyer, Fenton, and Stankey failed to ensure the integrity of the Company's internal controls, allowing the misleading statements to be disseminated in the Company's SEC filings and other disclosures.  Thus, Klausmeyer, Fenton, and Stankey breached their fiduciary duties and are not disinterested, and demand is excused as to them.

**Defendants Bearden, Cormier, Fenton, and Klausmeyer**

117.    Bearden, Cormier, Fenton, and Klausmeyer were directors of Hortonworks, which merged with Cloudera in January 2019.  Because of these business relationships, there is reasonable doubt as to these defendants' disinterestedness in deciding whether pursuing legal action is in the bests interests of the Company.  As a result, demand is excused as to Bearden, Cormier, Fenton, and Klausmeyer on this basis as well.

**Defendant Hammonds**

118.    Hammonds was a former Member of the Management Board and Group Chief Operating Officer of Deutsche Bank AG, which paid approximately $13.6 million to the Company in the year ended January 31, 2019 for subscriptions and services in the ordinary course of business.  As a result, demand is excused as to Hammonds on this basis as well.

**Defendant Schooler**

119.    Schooler is not an independent director.  She owns 9.5% of the Company's outstanding shares, and she was nominated to the Board by Intel Corporation, which owns 9.5% of Cloudera's stock.  Indeed, the Company's 2019 proxy statement states that Schooler is not independent.  As a result, demand is excused as to Schooler on this basis as well.

<u>**COUNT I**</u>

**Against the Individual Defendants for Breach of Fiduciary Duty**

120.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

121.    Each Individual Defendant owes and owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Cloudera's business and affairs, particularly with respect to issues as fundamental as public disclosures.

122.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company.  The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Cloudera.

123.    In breach of their fiduciary duties owed to Cloudera, the Individual Defendants willfully participated in and caused the Company to expend unnecessarily its corporate funds, rendering them personally liable to the Company for breaching their fiduciary duties.

124.    In particular, the Individual Defendants knowingly or recklessly made untrue statements and/or permitted the Company's public filings, disclosures, and statements to misleadingly report revenue and the Company's overall prospects.

125.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Cloudera has sustained and continues to sustain significant damages, including direct monetary damages, exposure to liability from securities litigation and a loss of goodwill in the capital markets.  As a result of the misconduct alleged herein, defendants are liable to the Company.

## COUNT II

### Against Defendant Olson for Unjust Enrichment

126.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

127.    By his wrongful acts and omissions, Defendant Olson was unjustly enriched at the expense of and to the detriment of Cloudera.

128.     Defendant Olson sold Cloudera stock for a profit during the period of deception, misusing confidential non-public corporate information.  He sold more than $9 million worth of shares in the Company's secondary public offering conducted in September 2017.

129.     Plaintiff, as a stockholder and representative of Cloudera, seeks restitution from Defendant Olson, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by Defendant Olson from his wrongful conduct and fiduciary breaches.

130.     Plaintiff, on behalf of Cloudera, has no adequate remedy at law.

## COUNT III
### (Derivative Claim for Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Promulgated Thereunder Against the Individual Defendants)

131.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

132.     This Count is asserted on behalf of the Company against Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

133.     Defendants, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the U.S. mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon the Company; made or disseminated various false and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made or disseminated, in light of the circumstances under which they were made or disseminated, not misleading; made or disseminated the above statements intentionally or with a deliberately reckless disregard for the truth; and employed devices and artifices to defraud in connection with the misleading disclosures, which were intended to, and did deceive the Company: (i) that Cloudera's Hadoop-based technology was becoming dated; (ii) that Cloudera suffered from pricing and servicing disadvantages because competitors' products

are more fully integrated with their other product offerings that had already been adopted by businesses; (iii) that, as a result, Cloudera could not overcome competition from new cloud-based offerings such as Amazon Web Services, Microsoft Azure, and Google Compute Cloud; (iv) that Cloudera experienced difficulty identifying large enterprises to adopt its Hadoop-based platform; (v) that Cloudera experienced decreasing opportunities to sign up new customers; (vi) that Cloudera's "land and expand" strategy was unsuccessful because relatively few customers were willing to expand their use of the Company's products; (vii) that, as a result of the foregoing, Cloudera would invest substantial capital in sales and marketing activities to generate new revenues; and (viii) that, as a result of the foregoing, Cloudera could not generate annual positive cash flows for the foreseeable future.

134.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon the Company in connection with the misleading disclosures.

135.    As alleged herein, Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced  in  the issuance  or  dissemination  of  such  statements  or  documents  as  primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Cloudera, their control over, and/or

receipt and/or modification of Cloudera's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning Cloudera, participated in the fraudulent scheme alleged herein.

136.    As a result of Defendants' misconduct, Cloudera is suffering litigation expense and reputational harm in the marketplace in violation of section 10(b) of the Exchange Act and SEC Rule 10b-5.

137.    Plaintiff brought this claim within two years of its discovery of the facts constituting the violation and within five years of the violation.

**COUNT IV**
**(Derivative Claim for Violations of Section 20(a) of the Exchange Act Against Defendants**
**Reilly and Frankola)**

138.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

139.    This Count is asserted on behalf of the Company against Defendants Reilly and Frankola for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

140.    During their tenure as executive officers, Defendants Reilly and Frankola were controlling persons within the meaning of Section 20(a) of the Exchange Act.  By reason of their absolute control, Defendants Reilly and Frankola had the power and authority to direct the management and activities of the other executive employees, to hire and fire other executive employees at whim, and to cause other executive employees to engage in the wrongful conduct complained of herein.  Defendants Reilly and Frankola were able to and did control, directly or indirectly, the content of the public statements made by all other executive employees at all relevant times, including the materially misleading financial statements, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

141.    In their capacity as the senior executives, Defendants Reilly and Frankola had direct involvement in and oversight over the day-to-day operations of the executive employees and the Company's employees, who would not act unless Defendants Reilly and Frankola agreed with their course of conduct.

142.    As set forth above, Defendants Reilly and Frankola violated Section 10(b) of the Exchange Act by his acts and omissions as alleged herein.  To the extent Defendants Reilly and Frankola are not the makers or disseminators of a specific false or misleading statement made by the Company, Defendants Reilly and Frankola are liable pursuant to Section 20(a) of the Exchange Act.

143.    As a direct and proximate result of their conduct, the Company suffered damages in connection with its misleading disclosures.

## COUNT V

### (Against Reilly, Olson, Cole, Hammonds, Li, Schooler, Sordello, and Stankey for Violation of Section 14 of the Securities Exchange Act of 1934)

144.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

145.    Rule 14a-9, promulgated pursuant to §14(a) of the Securities Exchange Act of 1934, provides that no proxy statement shall contain "any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9. Specifically, the Company's proxy statement filed on May 16, 2018 violated §14(a) and Rule 14a-9 because it misrepresented the Board's actual activities with respect to risk management while soliciting votes to reelect and

compensate directors who were breaching their fiduciary duties, and it concealed that representations in the IPO Registration Statement were misleading.

146.    In the exercise of reasonable care, defendants should have known that the statements contained in the proxy statement were materially false and misleading.

147.    The misrepresentations and omissions in the proxy statement were material to Company shareholders in voting on the proxy statement. The 2018 proxy statement solicited shareholder votes for: (i) director nominees; and (ii) ratification of the appointment of the Company's independent auditor.   The proxy statement was an essential link in the accomplishment of the continuation of defendants' continued violation of their fiduciary duties.

148.    The Company was damaged as a result of the defendants' material misrepresentations and omissions in the proxy statement.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of Cloudera, demands judgment as follows:

A.    Declaring that plaintiff may maintain this action on behalf of Cloudera and that plaintiff is an adequate representative of the Company;

B.    Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

C.    Declaring that Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Cloudera;

D.    Directing Cloudera to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Cloudera and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the

Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1.      a proposal to strengthen the Company's controls over financial reporting;

2.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

3.      a proposal to strengthen Cloudera's oversight of its disclosure procedures;

4.      a provision to control insider transactions; and

5.      a provision to permit the stockholders of Cloudera to nominate at least three candidates for election to the Board;

E.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Cloudera has an effective remedy;

F.      Awarding to Cloudera restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

G.      Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

H.      Granting such other and further relief as the Court deems just and proper.

## <u>JURY DEMAND</u>

Pursuant to Fed. R. Civ. P. 38(b), plaintiff demands a trial by jury.

Dated: September 5, 2019


**OF COUNSEL:**

GLANCY PRONGAY & MURRAY LLP
Matthew M. Houston
Benjamin I. Sachs-Michaels
712 Fifth Avenue
New York, New York 10019
Telephone:  (212) 935-7400
E-mail: bsachsmichaels@glancylaw.com

GLANCY PRONGAY & MURRAY LLP
Robert V. Prongay
Lesley F. Portnoy
Pavithra Rajesh
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone:  (310) 201-9150
Facsimile:  (310) 210-9160
E-mail:  rprongay@glancylaw.com

Respectfully submitted,

FARNAN LLP

/s/ Michael J. Farnan
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 N. Market Street, 12th Floor
Wilmington DE 19801
Telephone: (302) 777-0300
Facsimile: (302) 777-0301
Email: bfarnan@farnanlaw.com
Email: mfarnan@farnanlaw.com

*Counsel for Plaintiff*